## BOLES v. NASH.

No. 19427. Opinion Filed May 13, 1930.

Rehearing Denied Sept. 30, 1930.

Bierer & Bierer, for plaintiff in error.

John J. Hildreth and A. V. Dinwiddie, for defendant in error.

HALL, C. This action was instituted in the district court of Logan county by Lucy Nash against R. C. Boles, to cancel and set aside an oil and gas grant of mineral rights in and to an undivided one-third interest in 160 acres of land. Fraud is the foundation of the cause of action. The facts in the case, including the history of the transaction, are as follows:

The plaintiff (defendant in error herein), Lucy Nash, was a negro woman 72 years of age. Boles, the defendant (plaintiff in error herein), was an alert business man, an automobile salesman and oil lease dealer. A few years prior to the execution of the instrument in question, the husband of Lucy Nash had died, and the administration of his estate was had before the Honorable A. H. Boles, judge of the county court of Logan county. The estate was administered and handled through this court by Judge Boles in a highly satisfactory manner. Judge Boles was the father of R. C. Boles, the defendant. Lucy Nash desired to sell an oil and gas lease on the land, and she made inquiry concerning a purchaser from Judge Boles. He directed her to his son "Roscoe," or R. C. Boles, the defendant in this action. R. C. Boles purchased the lease and paid her full value for same, and, in fact, paid her more than it was worth. The land was in what is termed "unproven" or "wildcat" territory; and he took a short term lease instead of a long term lease. The consideration for this lease was $1 per acre each year in advance.

These matters relating to Judge Boles have no relationship to this case save and except that this old woman rightfully had a great deal of confidence in him; and her credulity no doubt caused her to put too much reliance and confidence in her succeeding transactions with R. C. Boles, concerning which this controversy arose.

After this oil lease had run for about two years, and just before it would expire by its own terms unless the $160 annual rental be paid, the defendant drew up a set of instruments to his own liking, and went down to the home of this old negro, Lucy Nash, and had her and some other negroes, her kinsmen, get in an automobile and go to the town of Meridian and there execute these instruments. Boles also executed one instrument himself, which was an assignment back to Lucy Nash of an 80-acre interest in the said oil and gas lease which he had taken two years before and on which it was necessary to pay rental in order to keep it alive. He obtained a mineral grant or mineral deed from plaintiff, Lucy Nash, conveying to him all her interest in the oil, gas, and other minerals in the land. She was the owner of an undivided one-third interest in the 160 acres of land, which interest she inherited from her deceased husband. The purported consideration for this mineral grant was the assignment of this partially expired short-term lease on the land in which the mineral rights of the assignee were being perpetually alienated; and, in addition thereto, a rather remarkable and novel agreement, which, in terms, recited that, in case a 500-barrel oil well was discovered on the land in which the mineral rights were conveyed, or within one-half mile thereof, defendant would pay plaintiff the sum of $1,000, a little less than $20 per acre.

One of the vital provisions of this conditional agreement or conditional due bill was as follows:

"The said R. C. Boles agrees to pay to the said Lucy Nash $1,000, provided, however, that a commercial oil well (producing 500 barrels of oil), is drilled on or within one-half mile of the above described northeast quarter of section 31, township 16 north, range 1 east."

Plaintiff's testimony was to the effect that she did not know she was divesting herself of the oil and gas rights in and to her land; and that, as defendant had told her that he was turning back a part of the lease, in signing this instrument, she thought she was signing something necessary to be signed in order that she might be reinvested with the lease.

A trial was had, at which considerable testimony was introduced, and a general finding and judgment in favor of plaintiff was rendered against defendant, canceling this mineral deed. The defendant appealed, and bases his claims for relief or reversal of the judgment upon the propositions that: (1) The transaction was fair, and that the mineral deed was executed for an adequate consideration; (2) that the plaintiff, though illiterate, was not ignorant, that she knew the nature of the transaction and the consequences thereof; and (3) that plaintiff failed to establish fraud or "over-reaching" conduct on the part of the defendant to that degree of certainty which the law requires before an instrument will be canceled or set aside because of fraud in procuring its execution.

The trial court did not make special findings of fact, but it appears to us that the matter of controlling consequence is that the transaction is unconscionable. The physical and admitted facts, to a very considerable extent, confirm the testimony and claims of plaintiff, this old negro woman. The transaction, the acquisition of this mineral grant, was practically, if not wholly, without consideration. The lease which was turned back or assigned to her was in undeveloped territory. This lease was the usual oil and gas and mining lease providing for the payment of annual rentals in advance, otherwise the lease would terminate on default of payment. This lease carried rentals of $160 per year, all inuring to Lucy Nash, by reason of a special agreement with the other owners of the land. The lease had about three years to run when this transaction involving the sale of the mineral rights was consummated. In order to keep this lease alive, it was necessary that $160 each year be paid for the three remaining years.

In addition to the common knowledge of men, especially the legal profession in this state, and all persons having even a general knowledge of the nature and workings of the oil industry relating to leases and royalty rights, this lease was worthless; that is, it had no market value. The unexpired term was too short in undeveloped territory. The defendant himself furnished testimony to that effect, in which he said that the value of the lease to the plaintiff would be that she could use the unexpired term in adding it to a long term lease and make the lease of some value. His exact language was that "she could put a long time lease on it." On this point, he further testified as follows:

"A. Yes, sir; I gave her that lease which took a long time to get executed, and she could sell it if she wanted to, or if she didn't want to sell it, she **could make a long time lease on it, and give a ten-year lease, which the oil companies were requiring at that time.** * * * Q. But you couldn't sell an oil and gas lease to an oil company at that time, running three years. A. They preferred a long time lease. Q. They weren't buying that kind? A. **That is the reason I gave back the assignment.**"

In this connection counsel for defendant very strenuously insist that the mineral rights which defendant purchased were not worth over $4 per acre. If that be true, that contention tends to confirm the conclusion that a three-year lease compelling the payment of $3 for each acre during that period of time, was a liability instead of an asset. The payment of rentals on such a lease for four years would be equivalent to paying for the value of the mineral rights themselves.

With reference to the conditional due bill which defendant gave the plaintiff—the agreement to pay plaintiff $1,000 in case a 500-barrel commercial well was discovered on the premises, or one-half mile thereof—we are compelled to say that such instrument is certainly a novel medium of payment for anything of value. This instrument or due bill was for the conditional payment of the sum of $1,000 for the absolute and perpetual oil and gas rights in 53 1/3 acres of land, or an undivided one-third interest in 160 acres. There was evidence introduced that, with an oil well on this land, or within one-half mile thereof, producing 500 barrels per day, this would cause its oil royalty value to be approximately $700 or $800 per acre. Under this agreement, plaintiff was to get nothing for the alienation of these oil and gas rights unless the settled commercial value thereof

should rise to $700 or $800 per acre. Then she would get about $20 per acre if defendant fulfilled his agreement.

This whole transaction is analogous to a situation like this: A tenant is in constructive possession of premises under a lease contract for a period of three years, in consideration of which he must pay three times $160 or the sum of $480. He is getting nothing out of the premises, as they are unimproved, and before one of these installments becomes due, he goes to the landlord or owner of the premises, and says: "I cannot pay you the rental of $160 due on this unimproved land, and I will release or assign you the lease or rental contract and give you an opportunity to pay, instead of receive, this $160 per year, and for such an assignment you give me a deed to the premises." The absurd nature of such a transaction is clearly apparent.

Learned counsel for plaintiff in error make a rather extended and ingenious argument relative to the fact that immediately after defendant assigned this lease or a portion of it back to the plaintiff, he made two 20-acre lease assignments, included in the remaining 80 acres, to some parties, and received the sums of $100 and $125, respectively. While the defendant testified that he sold these two leases for the consideration in the aggregate of $225, he further testified, and his testimony clearly indicates, that these sales were made to others than oil producers, or even to dealers in oil property. He sold one to a Mr. Campbell, whom he styled "a business man in Oklahoma City." It does not appear that he was able to sell any other part of the 40 acres. From defendant's own testimony quoted in a preceding paragraph, and from general observation, we might conclude that it was humanly possible for this old negro woman to sell or assign some portion or all of this lease, and get some consideration from some person having no knowledge of the value of an oil and gas lease, but it may be said that such was highly improbable.

The value of an oil lease rests upon the probability that an oil producer will be interested in it. He is the person whose interest therein renders the instrument something more than a scrap of paper. Unless an oil and gas lease finds its way to the oil producer—and it doesn't find its way there unless he wants it—the lease almost invariably expires with its fixed term. This partially expired lease in this case was not an exception to the rule, and there was nothing unreasonable about plaintiff's testimony that defendant represented to her that he was turning back the lease, after he had had two years within which to speculate on its sale. The writer thinks that it was good business to turn it back, or cease paying rentals on it, in which case it would be "turned back" by operation of law.

We are entirely familiar with the rule in this jurisdiction, as well as in other jurisdictions, that ordinarily inadequacy of consideration will not within itself be sufficient to set aside a conveyance otherwise regularly and properly executed; but it has always been the rule here and elsewhere that, when the consideration for the conveyance or contract is so inadequate or so grossly inadequate as to "shock the conscience," the contract must fall on that ground alone. The metaphysical distinction is sometimes made that it is not the inadequacy of the consideration which overthrows the contract, but such inadequacy is such evidence of fraud that the court will set aside the instrument on the ground that a grossly inadequate consideration amounts to constructive fraud. The result is the same in either case. This rule is as old as equity itself, and has found expression in many cases by this court, one of which is Bruner v. Cobb, 37 Okla. 228, 131 Pac. 165, in which case this subject was considered and treated at length, and lengthy supporting quotations from that pre-eminent author of Equity Jurisprudence, Pomeroy, are quoted in the opinion. The case of Bruner v. Cobb bears a close analogy to the present case, except that in that case $150 in cash and a worthless note was paid for 160 acres of land worth from $2,400 to $4,000.

In the present case, the plaintiff got nothing save and except a promise to pay her $1,000 in case her land should become of such value as to readily command a price of about $42,000. In the Bruner-Cobb Case, the unconscionable transaction, like the present case, was had with ignorant negroes, and much that was said in that case is apposite to the case at bar. In the course of the opinion, the court said:

"Ignorant freedmen (negroes), such as plaintiffs in error, have a right to rely upon honesty of purpose and fair dealing at the hands of white men; * * * they have been taught to depend upon the superior intelligence and integrity of the white race; and while the law recognizes no distinction of race or color, and is not, generally speaking, the guardian of the ignorant, yet it will at all times, especially in such cases as the one at bar, throw its protecting arms about the weak and defend their rights, against

the wicked designs of the strong, when the object of these designs is to take an unfair and undue advantage of their weakness and ignorance. We feel that the facts detailed in the record in the instant case are such as to demand at our hands the relief prayed for by plaintiffs in error. We cannot think that the motive which prompted the giving of $150 cash and the worthless due bill to Milton and Katie Bruner for 160 acres of land worth $3,000 (even if defendant's story be true) is of such character as will appeal very strongly to honest men. * * *"

Also, the case of Griffith v. Scott, 128 Okla. 125, 261 Pac. 371, and cases therein cited, directly support the findings and judgment of the trial court in this case.

In this connection it should be stated that no inferences of wrongdoing or improper conduct are to be attributed to Judge Boles. It clearly appears that Judge Boles, the father of the defendant, had always advised this old negro woman wisely, and had rendered her commendable official and personal service in the administration of her deceased husband's estate.

That the transaction is wholly unconscionable, it is definitely clear: and the judgment of the trial court is not only not against the clear weight of the evidence, but was the proper judgment in the case.

In this connection, it may be mentioned that this due bill or conditional obligation to pay $1,000 was such an absurd document, that an ordinary notary public refused to take plaintiff's and defendant's acknowledgment to it. When Mr. McCloskey (the notary public) took the old woman's acknowledgment to the mineral deed, and Boles' acknowledgment to the assignment of the oil and gas lease, this paper, the conditional due bill, was presented to him for acknowledgment also. He looked it over and dropped it on the counter as if it were hot. Regarding this instrument, he testified:

"A. After reading the contract, I noted its contents and I said to Mr. Boles, 'Mrs. Nash is an illiterate old woman, and I refuse to have any more to do with this transaction'."

In addition to the language set forth in the opinion in the case of Bruner v. Cobb, supra, the language of the court, in the Indiana case of Whitesell v. Strickler, 167 Ind. 602, 78 N. E. 845, 119 A. S. R. 524, has at least indirect, if not direct, application to the facts in the present case. The language is as follows:

"In situations like this, and in all cases

where the relations in life are such that influence is acquired by one and confidence reposed by another, so as to give rise to opportunity for imposition or undue influence, such as arise between guardian and ward, parent and child, husband and wife, principal and agent, and the like, **and where one of the parties, by reason of his surroundings, is unable to treat with the other upon terms of equality,** courts of equity will carefully scrutinize the dealings between them and compel restoration in the absence of absolute fairness. 'In such cases,' says Judge Story, 'the one subject to undue influence has no free will, he is in vinculis, and the constant rule in equity is that where a party is not a free agent and is not equal to protecting himself, the court will protect him.' 1 Story's Equity (13th Ed.) sec. 239. And this rule in equity is not confined to formal relations, such as those alluded to, but extends to every case where confidence exists on one hand and influence on the other, 'from whatever cause they may spring'." (Emphasis ours).

Under any view of this case, it cannot be said that the findings of the trial court are clearly against the weight of the evidence, which we would necessarily have to find in order to reverse the judgment.

The judgment of the trial court is hereby affirmed.

TEEHEE, HERR, EAGLETON, and DIFFENDAFFER, Commissioners, concur.

By the Court: It is so ordered.

Note.—See under (1) anno. L. R. A. 1916D, 377; 4 R. C. L. p. 501; R. C. L. Perm. Supp. p. 1149.